STATE OF NEW HAMPSHIRE
SUPERIOR COURT

U.S. DISTRICT COURT
DISTRICT OF N.H.
FILED

HILLSBOROUGH, SS

JUNE TERM 2007: 48
2004 SEP -4 A 07

STATE OF NEW HAMPSHIRE

v.

SEVERINE WAMALA
06-S-2270-2303

## APPLICATION FOR JOINDER/MOTION TO CONSOLIDATE

NOW COMES the accused, Severine Wamala, by and through his counsel Anthony Sculimbrene and Seth D. Abramson, and respectfully requests that this Honorable Court grant his application for joinder and consolidate the above captioned charges into one case. As basis for this motion the accused relies on his right to due process and all proofs favorable under Part I, Article 15 of the New Hampshire Constitution and the 5th and 14th Amendments to the U.S. Constitution. He also relies on the severance/consolidation standard set forth in State v. Ramos, 149 N.H. 118 (2003) and followed by State v. Abrams, 153 N.H. 619 (2006) and Petition of the State of New Hampshire (State v. San Giovanni), __ N.H. __ (2007).

### FACTS

1. The State accuses Dr. Severine Wamala of various sexual assault-related offenses against his three daughters—Jessica, Lwiza, and Theresa Wamala.

2. The facts in this Motion to Suppress are taken exclusively from the information provided in the State's discovery.

3. When Lwiza was initially interviewed by the police she told Officer Bergeron that "she did not believe that her father had been raping Jessica." See Officer Lehto's

A.1

3.  In her first interview on September 12, 2007, Lwiza Wamala not only denied that

her father sexually assaulted her, she expressed total disbelief at Jessica's story.

   a.  Officer Bergeron interrogates Lwiza at 6:53 AM.  She fervently denies

   being assaulted.  According to the transcript, the following is said:

   Officer Bergeron:  OK. Um, has there ever been any touching or

   anything like that going on between the two of you when you're in

   bed?

   Lwiza: No.

   Bergeron: No?  Nothing?

   Lwiza: Nothing.

   b.  Officer Bergeron asks Lwiza if she had ever seen Dr. Wamala and Jessica

   alone.  Lwiza tells him no.  He continues on.

   Officer Bergeron: Or what do you think about what, um, what,

   what your sister's saying?

   Lwiza: I think it is ridiculous...Oh my God.  I have never heard

   such a thing.

   .....

   Lwiza:  I would say that because I, I don't think dad would do that.

   c.  Officer Bergeron closes the interview with a claim designed to get Lwiza

   to echo her sister's allegations.  He tells Lwiza that "your sisters saying

   that your father, for all intents and purposes, has been raping her for quite

   some time now."  He then says:

A.2

Officer Bergeron: But nothing, nothing like that's going on with you and your Dad?

Lwiza: No.

4. In Theresa's interview on September 12, 2007 she doesn't remember what happened and cannot say, for sure, whether Dr. Wamala had sexual intercourse with her.  Counsel notes that Theresa was twenty-three years of age at the time of the interrogation.

   a.  At 11:52 AM, Detective Moushegian interviews Theresa.  The following is said:

      Detective Moushegian: …Did his penis go inside your vagina?

      Theresa: I don't really recall…

      ….

      Detective Moushegian: OK.  Did he go inside your vagina?

      Theresa: I don't recall exactly

   b.  Then, towards the end of the interview Detective Moushegian changes the topic abruptly.  The following is said:

      Detective Moushegian: Alright.  Are you a U.S. citizen?

      Theresa: I'm becoming one.

      Moushegian: OK.

      Theresa: Well, I filed my papers

      Moushegian: OK. Are you grateful to be here in this country?

      Theresa: Yes.

A·3

> Moushegian: Alright. Do you think that sense of gratitude and the, the appreciation that you're in a county where there's, it's, we're not at civil war, do you think that might be effecting your, your, your reasoning for just ignoring the fact that your father's touching you like this?

5. In Pamela Wamala's interview on September 15, 2007, she confirms that Jessica has a history of lying, expresses disbelief at the charges, and tells the Detective that Dr. Wamala had no unusual sexual predilections.

    a. Detective Lehto asks Mrs. Wamala about Jessica and Jacob and the following is said:

> Detective Lehto: Ok are they prone to making stories up or anything like that?
>
> Mrs. Wamala: Um, I wouldn't say that they are prone to making up stories I would say one of them has had an ongoing issue with lying at times.
>
> Lehto: Ok who would that be?
>
> Wamala: Jessica.

    b. Detective Lehto then inquires of Mrs. Wamala regarding whether the alleged actions comported with what she knew of Dr. Wamala and the following is said:

> Detective Lehto: Um is this something you would expect out of him?
>
> Mrs. Wamala: Never.

A. 4

Lehto: Um was he ever unfaithful during the marriage?

Wamala: Not to my knowledge.

Lehto: Um have any particular um sexual preoccupations or anything?

Wamala: No.

….

Lehto: Ok um was this ever an issue with the two of you sexually or anything like that.  Was there ever any time that he forced himself on you?

Wamala: No

Lehto: Ok so its not something you would have expected out of him?

Wamala: Never.

c.  Detective Lehto also inquired into what, if anything, Mrs. Wamala knew about the allegations.

Detective Lehto: Ok did any of the children ever mention any of these things to you while they were living with you?

Mrs. Wamala: No.

Lehto: Afterwards?

Wamala: No.

Lehto: Ok

Wamala: The first I heard of it was Monday, that Monday on the phone with Jessica.

Lehto: And never had any suspicions prior to that?

Wamala: No.

6. The Court (*Hampsey*, J.) severed Dr. Wamala's case into three separate cases *sua sponte*. The three cases corresponded to the three complaining witnesses— Jessica, Lwiza, and Theresa. The Court did so out of a concern for Dr. Wamala's ability to receive a fair trial. At the time the cases were severed, the accused, through counsel, requested the Court leave the cases joined together. The State then filed a motion to reconsider the *sua sponte* severance. At the last hearing, the accused again requested that the cases be joined. This request is based on counsel's comprehensive familiarity with the facts of the case, the strategy for trial, and the law of severance and joinder.

7. Jessica's false allegations of sexual assault were the but-for cause of the allegations made by her sisters. There was no prior investigation into assaults on Lwiza or Theresa before Jessica's allegations. Without Jessica's false story the two other women would have never been interrogated by the police. Jessica's false allegations are the propulsive force behind all three sets of charges. As such, these cases should be joined because their genesis is based on the same event— Jessica's report of false allegations to the police. Additionally the evidence that proves Dr. Wamala's innocence is inextricably intertwined. The denials on the part of Lwiza and Theresa not only implicate their own charges but Jessica's charges as well. Lwiza in particular expresses incredulity at Jessica's allegations. Similarly, Pamela Wamala's sweeping statements about Jessica's propensity to

A.6

lie, her husband's sexual behavior, and her knowledge of what was happening the
house all indicate that Jessica's story is a lie.

## **LEGAL ARGUMENT I:**

## **JOINDER IS PERMITTED UNDER *STATE V. RAMOS***

8.  In State v. Ramos, 149 N.H. 118 (2003) the New Hampshire Supreme Court
    explicitly adopted the ABA Standard for Severance and Joinder.  In that case the
    Court held that severance and joinder are issues of constitutional magnitude in
    that they impact the accused's right to due process and all proofs favorable.  See
    Part 1, Article 15 and the 5th and 14th Amendments to the U.S. Constitution.  In
    adopting the ABA standard the Court held "…[h]enceforth, any two or more
    offenses committed by the same defendant may be joined for trial upon
    application of the prosecuting attorney *or the defense*…"  State v. Ramos, 149
    N.H. 118, 128 (2003) quoting 2 Am. Bar Ass'n Standards for Criminal Justice,
    ch. 13 at 13.11 [Emphasis Added].  This language means that joinder by the
    accused is always discretionary.

9.  The Court in Ramos makes clear—the overwhelming concern with severance and
    joinder of cases relates to the prejudice to either the State or the accused's case.
    In this case, both the State and the accused are on record as being in favor of
    joinder.  As such the primary concern relating to severance and joinder has been
    thoroughly addressed on the record by both parties.

10. The Ramos Court feared that consolidated, unrelated charges would allow the jury
    to hear too much irrelevant and prejudicial information and thus corrupt the
    determination of guilt or innocence.  See Id. at 122, 125, and 127-128.  Given the

A-7

facts of this case detailed above, the trial strategy, and the state of the law, these concerns do not exist in this case.  The information from Lwiza and Theresa's cases directly implicates the veracity of Jessica's claims.  As such, the application for joinder of the cases should be granted.

11. As such, pursuant to Dr. Wamala's right to all proofs favorable and due process, this application for joinder should be granted and these cases should be consolidated.

## LEGAL ARGUMENT II:

## DR. WAMALA'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL ENTITLES HIM TO A CONSOLIDATED TRIAL

12. Individuals accused of a crime are entitled to effective assistance of counsel.  See Part I, Article 15 of the New Hampshire Constitution and the Sixth Amendment to the U.S. Constitution.  Part of this right to effective assistance of counsel includes deference to defense counsel's strategies at trial.  See State v. Kepple, __ N.H. __ (2007) quoting State v. Flynn, 151 N.H. 378 (2004).  In Kepple the Court held that "…[w]e afford a high degree of deference to the strategic decisions of trial counsel, bearing in mind the limitless variety of strategic and tactical decisions that counsel must make…" State v. Kepple, __ N.H. __ (2007).

13. The decision to consolidate is exactly the kind of decision discussed in Kepple.  It is a strategic decision firmly rooted in the facts of the case, especially those presented above.  The defense in this case has been and will be the same—these actions never happened.  In order to prove these allegations, the accused will rely on, among other things, the information included in the facts section above.  This

A.8

information indicates that all three sets of allegations are tied together.  The case started with Jessica's allegation.  The two other complaining witnesses directly or indirectly challenge the veracity of Jessica's claims.  They also specifically contradict their own charges.

14. Furthermore, consolidation lessens Dr. Wamala's chance of conviction.

   a.   All severance does in this particular is increase the chance of a conviction. As a result of severance Dr. Wamala does not simply have to win one case, he has to win three cases—each of which has identical charges, identical witnesses, and most importantly an identical defense.

   b.   From a purely statistical view, consolidation also favors the accused.  In a case such as this where there is no physical evidence and fervent denials by multiple parties severance is unnecessary.  There is little to no ability for information from one case to pollute or bias the other case.

15. As such, pursuant to Dr. Wamala's right to effective assistance of counsel, this application for joinder should be granted and these cases should be consolidated.

## LEGAL ARGUMENT III:

## DR. WAMALA'S RIGHT TO AN IMPARTIAL JURY MILITATES TOWARDS CONSOLIDATION

16. Individuals facing criminal charges have a right to all proofs favorable and due process, including the right to a trial by jury.  See Part I, Article 15 of the New Hampshire Constitution and the 5th and 14th Amendments to the U.S. Constitution; see also State v. Gerry, 68 N.H. 495, 496 (1896).  Individuals also

A.9

have a right to great care used in selecting impartial jurors. <u>See</u> Part I, Article 21 of the New Hampshire Constitution. <u>See</u> <u>also</u> Motion for Individual Voir Dire.

17. The level of publicity surrounding this case militates towards consolidation. Given that pre-trial publicity has been significant, it can be assumed that significant publicity will accrue to the first trial. This could taint the second and third trials. Thus, in order to get the best, fairest, and most unbiased jury possible, as is constitutionally required, these cases should be heard as one.

18. As such, pursuant to Dr. Wamala's right to impartial jury, these cases should be consolidated.

## **LEGAL ARGUMENT IV:**

## **DR. WAMALA'S RIGHT TO A SPEEDY TRIAL ALSO ENTITLES HIM TO A CONSOLIDATED TRIAL**

19. Individuals have a fundamental right to a speedy trial under the 6th Amendment and as part of their right to due process of law under the 14th Amendments to the US Constitution. <u>See</u> <u>Smith v. Hooey</u>, 393 U.S. 374 (1969). Defendants are entitled to be free from capricious and oppressive delays. <u>State v. Coolidge</u>, 109 N.H. 403, 412 (1969) quoting <u>Fleming v. United States</u>, 378 F.2d 502 (1st Cir. 1967). New Hampshire's speedy trial standard is exactly the same as the federal standard. <u>Compare</u> <u>State v. Allen</u>, 150 N.H. 290 (2003) and <u>Barker v. Wingo</u>, 407 U.S. 514 (1972).

20. Severing the trials simply delays Dr. Wamala's case even further and incarcerates him longer. Dr. Wamala and counsel have, at every occasion, pressed his right to a speedy trial. He has been incarcerated for more than nine

WHEREFORE, the accused respectfully requests that this Court:

    A. Grant both the accused's motions regarding 404(b) and the exclusion of evidence;

    B. Affirm its previous ruling regarding inadmissibility of the late discovery;

    C. If the Court is not willing to grant this motion on its face, hold a hearing on the record and make written findings of fact and rulings of law sufficient for use in appellate proceedings as recommended by case law.  See State v. McGlew, 139 N.H. 505, 508 (1995); see also State v. Simonds, 135 N.H. 203, 207 (1991).

    D. Grant all other relief as justice may require.

Respectfully submitted,

Anthony Sculimbrene
Jim Quay
Public Defenders

## CERTIFICATE

The above signed counsel certifies that this pleading has been forwarded to Assistant County Attorney Patricia LaFrance and First Assistant County Attorney Roger Chadwick on 22 of August, 2007.

A.11

THE STATE OF NEW HAMPSHIRE

SUPERIOR COURT

Hillsborough, ss.                                                    January Term, 2007
Southern District

STATE OF NEW HAMPSHIRE

06-S-2293-98
06-S-2299-2303

SEVERINE WAMALA

## <u>MOTION FOR A BILL OF PARTICULARS</u>

NOW COMES the defendant, Severine Wamala, by and through counsel, Scott Rankin,

and requests that this Court order the State to produce a Bill of Particulars listing with specificity

the date, location, and manner in which the alleged acts were committed by Mr. Wamala.  A bill

of particulars is necessary because it is not clear from the indictment and discovery where, when

and in what manner the alleged sexual assault occurred.  This motion is made pursuant to part I,

article and 15 of the New Hampshire Constitution and the fifth and fourteenth amendments to the

United States Constitution.  As grounds for this motion, it is stated:

### <u>FACTS</u>

1.      Mr. Wamala is charged with six counts of Incest involving his daughter, Lwiza,

between 7/23/06 – 9/12/06.  Each Incest indictment alleges that Mr. Wamala

"knowingly had sexual intercourse" with Lwiza.  Each indictment covers the time

period of 7/23/06 – 9/12/06.

2.      Mr. Wamala is also charged with five counts of Incest involving his daughter,

Theresa, between 10/1/05 – 9/12/06.  Each Incest indictment alleges that Mr.

A.12

Wamala "knowingly had sexual intercourse" with Theresa.  Each indictment

covers the time period of 10/1/05 – 9/12/06.

3.    Lwiza Wamala was interviewed by the Nashua Police Department at least five

times on 9/12/06 between 3:30 a.m. and 11:30 a.m.  Ms. Wamala was at the

police station the entire time.

4.    Lwiza was interviewed by Detective Bergeron at 3:30 a.m. In response to

questioning, Lwiza explained that her father had never touched her

inappropriately in any way and that she and her father never had sexual

intercourse.

5.    Lwiza provided a recorded statement to Detective Bergeron at 6:53 a.m.

indicating that there was no sexual contact between her and her father.

6.    Lwiza spoke with Detective Lehto at 8:30 a.m. and provided a recorded statement

to him at 10:57 a.m.  In that statement, Lwiza provided details about an incident

of sexual intercourse with her father.  She described the type of sexual

intercourse, the location, and the date.  Discovery provided by the State does not

include similar detail in regard to the other alleged offenses involving Lwiza.

7.    Detective Lehto's questioning included the following exchange:

| | |
|---|---|
| Det. Lehto: | Ok um and that wasn't the only time that you had sex with your Dad right? |
| Lwiza: | Correct. |
| Det. Lehto: | Ok how many times since then have you had sex with your Dad? |
| Lwiza: | Around six. |
| Det. Lehto: | I'm sorry. |
| Lwiza: | Around six. |
| Det. Lehto: | Around six more times. |
| Lwiza: | Yes. |
| Det. Lehto: | Ok. Um, and was it the same every time? |
| Lwiza: | Yes. |

A. 13

| | |
|---|---|
| Det. Lehto: | Was it ever different? |
| Lwiza: | No |
| Det. Lehto: | Was it always where he put his penis into your vagina? |
| Lwiza: | Yes. |

*(p233 of discovery; p13 of her transcribed statement)*

8.    Later in the interview, Detective Lehto asks the following questions:

| | |
|---|---|
| Det. Lehto: | Ok when was the last time you had sex with your Dad? |
| Lwiza: | I don't know. |
| Det. Lehto: | You don't know? |
| Lwiza: | No. |
| Det. Lehto: | Approximately how long ago do you know? |
| Lwiza: | No. |
| Det. Lehto: | Was, was it a week ago, two weeks ago...three weeks ago... |
| Lwiza: | I can't tell.  I don't know. |
| Det. Lehto: | You don't remember when it was? |
| Lwiza: | No. |
| Det. Lehto: | But you had sex with him about seven times since July 22nd, so that was the first time and then six other times? |
| Lwiza: | Yes |

*(p235 of discovery; p15 of her statement)*

9.    Detective Lehto interviewed Lwiza for the last time at 11:27 a.m.  The following

questioning occurred in that interview:

| | |
|---|---|
| Det. Lehto: | Um, the first time this happened on July 22nd okay um were you sleeping when this started? |
| Lwiza: | Yes. |
| Det. Lehto: | You were? |
| Lwiza: | Yes |
| Det. Lehto: | Ok um so this happened unexpectedly? |
| Lwiza: | Yes |
| Det. Lehto: | Okay so this wasn't something that you wanted at that time, you were sleeping? |
| Lwiza: | I was sleeping. |
| Det. Lehto: | Okay so you didn't ask him to do this? |
| Lwiza: | No. |
| Det. Lehto: | And you didn't want to have sex with your father that night? |
| Lwiza: | I didn't mind. |

A.14

WHEREFORE, for the above-stated reasons, Severine Wamala, by and through counsel, Scott Rankin, requests that this Court order the State to elect a theory under which it plans to pursue prosecution. A hearing is requested on this Motion.

Respectfully submitted,

Scott Rankin
New Hampshire Public Defender
188 Main Street
Nashua, NH 03060
(603) 598-4986

## CERTIFICATE OF SERVICE

I, Scott Rankin, hereby certify that a copy of this motion has been forwarded to Attorney Patricia LaFrance on this 2nd day of February 2007.

Scott Rankin

A·15

Seth

THE STATE OF NEW HAMPSHIRE
HILLSBOROUGH COUNTY SUPERIOR COURT — SOUTH  COPY

Hillsborough, ss.

STATE OF NEW HAMPSHIRE                                    May 7, 2007

v.                                                       #06-S-2270-2303

SEVERINE WAMALA

## MOTION FOR GAG ORDER

NOW COMES the defendant, Severine Wamala, by and through his attorneys, Seth D.

Abramson and Tony Sculimbrene, and respectfully requests that this Honorable Court issue

forthwith a comprehensive gag order on all participants to the instant case. The defendants

specifically requests that the Court direct this Order upon the New Hampshire Public Defender, the

Hillsborough County Attorney's Office, the Nashua Police Department, and the Division for

Children, Youth, and Families (DCYF). In order that this Motion not be rendered moot by the

actions of the enumerated parties prior to the Court's ruling on this Motion, counsel further requests

that none of the above-named parties issue statements to the media on the above-captioned matter

until this Motion is ruled upon. Counsel specifically cites Rule of Professional Conduct 3.6a in

making this explicit request. Further, counsel hereby places opposing counsel on notice that should

this request not be honored either by the Hillsborough County Attorney's Office or by any witness

mentioned in the State's discovery, counsel will seek an immediate change in venue in this matter.

As to the relief sought herein, counsel for the defendant respectfully requests that the Court adopt

the following as its Order:

1) Declare that all of parties aforementioned shall refrain from any further public statement

regarding any aspect of the above-captioned proceedings;

A. 16

2) Declare that any party found to have violated the provisions of the Order shall be guilty of indirect criminal contempt of court and shall immediately be scheduled for a show case hearing to address any such violation(s);

3) Declare that the duration of the said Order shall be the duration of criminal proceedings in the above-captioned matter, to include any collateral or direct appeals before, during, or after trial; and

4) Any such further relief as the interests of justice may require.

## FACTS

1. The State has brought thirty-four indictments against Dr. Wamala alleging AFSA and incest.

2. This case has been the object of substantial media attention both in New Hampshire and Massachusetts.

3. The reasons for this substantial media attention are several:

   a) the nature and number of the charges; and

   b) Dr. Wamala's prominent position as an educator in Massachusetts; and

   c) Dr. Wamala's standing as a public figure in the national competitive chess community; and

   d) the nature and circumstances of the interrogation of Dr. Wamala by law enforcement.

4. As a consequence of the above-enumerated features of this case, a number of local and regional media outlets have written stories about the proceedings in State v. Wamala, to include (see, e.g., Attachments):

   - *The Boston Globe*

   - *The Boston Herald*

- *The Lowell Sun*

- *The Nashua Telegraph*

- *The New Hampshire Union-Leader*

- WBZ-TV, Boston (NBC)

- WCVB-TV, Boston (ABC)

- 96.9 FM Talk [Boston] ("The Natural Truth" w/ Michael Graham)

5. In articles published by the above-captioned media outlets, statements from the following parties have been included: the defendant, Detective Captain Scott Howe of the Nashua Police Department, Assistant Hillsborough County Attorney Patricia LaFrance, Assistant Hillsborough County Attorney Roger Chadwick, Detective Lieutenant Richard Sprankle of the Nashua Police Department, Lowell School District Superintendent of Schools Karla Brooks-Baehr, and other officials connected to the Nashua (NH) and Lowell (MA) police departments.

6. Articles published as to the above-captioned matter have focused largely on two issues with notable political ramifications and reverberations:

   a) the screening of employees for teaching positions at public secondary schools; and

   b) the manner and circumstances of police interrogations of minority suspects.

7. Discussion of these matters in the press, particularly as fueled by any of the parties to this case, may distract attention from the only question before this Court: whether Dr. Wamala committed the acts he is alleged to have committed, or is in fact is innocent of these charges.

8. The allegations Dr. Wamala presently faces are precisely the type of "charged" allegations often sensationalized by the media. Incest is associated with a number of deeply-seated taboos in our society; likewise, the subject of alleged sex crimes has been forcibly brought to bear in popular culture through such shows as MSNBC's "To Catch a Predator" documentaries. Added

to the already public nature of Dr. Wamala's present employment, these features of the instant

case could create a situation ripe for exploitation by the press. Any statements made by parties

to this case, or parties associated with this case, could enflame the passions which already exist

surrounding the sort of sensitive issues this case brings to bear.

9.  Partly as a result of the instant case, the Commonwealth of Massachusetts is reviewing its

CORI (criminal record) procedures for prospective public employees. This ongoing effort has

likewise received substantial media scrutiny.

## LEGAL ARGUMENTS

10. Pursuant to <u>State v. Booton,</u> 114 N.H. 750 (1974), this Court has a "large measure of

discretion" in determining how to address prejudicial pre-trial publicity which reaches the ears

of jurors. Declaring a mistrial is one possible remedy. However, counsel seeks to avoid the

danger of a mistrial in the instant case by addressing the issue of prejudicial pretrial publicity

before the trial rather than afterwards. Counsel submits that the "large measure of discretion"

afforded the Court post-trial in remedying prejudicial publicity extends to taking proactive

preventative measures pre-trial.

11. Federal case law supports the conclusion that courts have the authority to issue comprehensive

gag orders on *all participants* of a case. In <u>Dobbert v. Florida,</u> 432 U.S. 282 (1977), the United

States Supreme Court, in upholding a murder conviction previously upheld by the Florida

Supreme Court, detailed the extensive actions taken by the trial court in order to ensure an

impartial trial. Justice Rehnquist, delivering the opinion of the Court, specifically cited with

approval a finding by the Florida Supreme Court that the trial court had "[done] everything

possible to insure an impartial trial for the defendant...[including issuing] a comprehensive gag order...on all participants of the trial." Id., at 362.

12. The New Hampshire Supreme Court has in the past reversed convictions on the basis of in-court statements to the jury which "may" have influenced their verdict, suggesting that out-of-court statements later found to have this same speculatively prejudicial effect could also be grounds for reversal. See, e.g., State v. Bujnowski, 130 N.H. 1 (1987) ("[W]e cannot determine the extent to which the jury *may* have been influenced by the prosecutor's comments; therefore, we reverse the conviction and remand for a new trial") [Emphasis supplied].

13. In Bujnowski, the State's most egregiously improper in-trial statements were held to be those which pointed toward the prosecutor's personal opinion of the case; with the instant Motion, counsel seeks to prevent the State from making public statements about this case which would clearly constitute the personal opinion of Dr. Wamala's prosecutors as to the credibility of his past statements.

14. Counsel makes the instant request pursuant not only to the inherent jurisdiction and authority of the Court with respect to prejudicial publicity (see, e.g., Booton), but also pursuant to Rule of Professional Conduct 3.6a: Trial Publicity, which states that "A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding."

15. Counsel submits that should the State comment on the withdrawal of a Motion in which certain allegations were made by the defendant through counsel, it will in effect be commenting on "the character, credibility, [or] reputation" of a party.  See R. P. C. 3.6(b)(1).

A · 20

16. All of the Nashua Police Department and DCYF investigators associated with this case are potential witnesses for the defense, and have been included on the defendant's preliminary witness list. This Court thus has authority over such individuals in the same manner it has authority over witnesses generally. Counsel notes, for instance, the Court's authority and jurisdiction with respect to orders of sequestration, which themselves necessarily include a "gag" component.

17. As the instant request does not involve a gag order being issued upon the media, the "clear and present danger to a fair trial" standard referenced in <u>Keene Publishing Corporation v. Cheshire County Superior Court</u>, 119 N.H. 710 (1979), does not apply. <u>See also</u> <u>Am. Bar Ass'n Standards Relating to Fair Trial and Free Press, Standard 3.1 (1968)</u>. Likewise, counsel's request in no way implicates the Freedom of the Press established in the First Amendment to the United States Constitution. <u>See</u> <u>id.</u>

18. Counsel seeks the instant Order only for the duration of criminal proceedings in the above-captioned matter, to include the duration of any collateral or direct appeals before, during, or after trial.

WHEREFORE, Dr. Wamala, by and through his counsel, respectfully requests that this Court:

    a) Grant this Motion; or

    b) Hold a hearing on this Motion, should any portion of it be denied; and

    c) Issue written findings of fact and rulings of law if any part of this Motion is denied; and

    d) Issue such other and further orders as the interests of justice may require.

Respectfully submitted,



A.21

Seth D. Abramson
Attorney for Dr. Wamala

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion has been forwarded to Assistant County Attorneys Roger Chadwick and Patricia LaFrance on this _8th_ day of May, 2007.

_____

Seth D. Abramson
Attorney for Dr. Wamala

A. 22

WITNESS STATEMENT - LWIZA WAMALA (9/12)
Ref: 06-61505-OF

# *Nashua Police Department*
## Voluntary Statement Form

CASE #:

DATE:                    TIME:                    PLACE:

I, _____ , give the following voluntary statement to _____ ,who has identified  as a member of the

Police Department.  has advised me and I understand the following:

    1.   I have the right to remain silent and not give this statement or incriminate myself in any way.

    2.   Anything I say in this statement can and will be used against me in a court of law.

    3.   Even if I cannot afford a lawyer, I have the right to have one paid for by the court and to talk to a lawyer for advice before giving this statement and to have him/her with me during this statement.

    4.   If I decide to give this statement now without a lawyer present, I still have the right to stop giving this statement  at any time.

    5.   No threats or promises have been made either against or to me to obtain this statement.

    6.   I knowingly and purposely waive my right to the advice and presence of a lawyer before and during this statement.

    7.   I give this statement voluntarily of my own free will and accord.

Signed_____

Witness_____    Date_____    Time_____

(TB)

DETECTIVE BERGERON:  Good morning. This is Detective Bergeron. It is September 12th, 2006. I's approximately 6:53 am. I am in a YSD interview utilizing a digital handheld recorder. In the room with me is Victim/witness Advocate Brenda Gibson and La...Lwiza Wamala, correct? Did I say your name right? Can you just spell your first and last name for me?

LWIZA WAMALA: L, L W I Z A.

DETECTIVE BERGERON:  And your last name for me?

LWIZA WAMALA: L W.... Sorry.... W A M A L A.

DETECTIVE BERGERON:  And what's your date of birth?

LWIZA WAMALA: Um, um, (inaudible) 10-88.

A.23

Ref: 06-61505-UF

LWIZA WAMALA: Ya. So I can't tell you....

DETECTIVE BERGERON:   Alright. So you're, you're already asleep when he comes in? So you don't.... Is that why you're saying you don't know?

LWIZA WAMALA: Ya, I really,.... When I'm awake....

DETECTIVE BERGERON: Yup.

LWIZA WAMALA: I haven't seen him naked.

DETECTIVE BERGERON: OK.

LWIZA WAMALA: When I'm asleep...

DETECTIVE BERGERON: OK. Um, has there ever been any touching or anything like that going on between the two of you when you're in bed?

LWIZA WAMALA: No.

DETECTIVE BERGERON: No? Nothing?

LWIZA WAMALA: Nothing.

DETECTIVE BERGERON:   OK. Um, has there ever been any type of sexual activity whatsoever? ?

LWIZA WAMALA: No.

DETECTIVE BERGERON:   What do you think about that? Or what do you think about what um, what, what your sister's saying?

LWIZA WAMALA: I think it's ridiculous.

DETECTIVE BERGERON: OK.

LWIZA WAMALA: Oh my God. I have never heard such a thing.

DETECTIVE BERGERON: OK.

LWIZA WAMALA: But when she said it, I, I think I said this before. It's like, I lost, I was like.... dad, my heart like (Inaudible) and like I had lost like control.

DETECTIVE BERGERON: Ya.

LWIZA WAMALA: Cause I told you I had some heart problem.

DETECTIVE BERGERON: Um hum.

LWIZA WAMALA: (Inaudible) really? (Inaudible) how can you say that?

DETECTIVE BERGERON: Ya.

IZA WAMALA: To me. I would say that because I, I don't think dad would do that.

DETECTIVE BERGERON: OK

A·24



NASHUA POLICE DEPARTMENT

## CONSENT TO SEARCH FORM

I, _Luiza Wamala_ , having been informed of my Constitutional Right not to have a search made of my ☐ premises, ☐ automobile, ☒ person, without a Search Warrant and of my right to refuse to consent to such a search, do hereby authorize the below listed individuals, who have identified themselves to me as law enforcement officers, to conduct a complete search of my ☐ premises, ☐ automobile, ☒ person, situated at _O Panther Drive_ _Nashua, NH_

They are also authorized to remove any letters, papers, materials or other property which they may desire. I understand that anything discovered may be used against me in a criminal proceeding.

This consent to search has been given by me voluntarily and without threats or promises of any kind.

_____
(Officer's Signature)

_____
(Signature of Individual)

_____
(Officer's Signature)

_h Seroc_
(Date)

_1140_
(Time)

NPD #04-05

A-25



**Nashua Police Department**

Page: 1

09-12-06 0830 HOURS - LWIZA WAMALA

Ref: 06-61505-OF

On 12Sep06 at approximately 0830 Hours, I made contact with Lwiza Wamala in the YSD Waiting Room. Earlier that evening, Lwiza's sister, Jessica Wamala, had disclosed that their father, Severine Wamala, had been "raping her for a long time." Lwiza had therefore responded to the Nashua Police Department in order to provide a formal statement reference the disclosure and was interviewed by Detective T. Bergeron.

During the interview, Lwiza advised Detective Bergeron that she did not believe that her father had been raping Jessica. Lwiza further denied that Severine had ever touched her in an inappropriate manner or that they had engaged in sexual intercourse. However, based on Jacob and Jessica's statements reference the living/sleeping arrangements at their residence, I was concerned that Lwiza was withholding information out of fear and embarrassment. I therefore made contact with her in the YSD Waiting Room and escorted her to YSD Interview Room #2. I then again questioned her further reference the living/sleeping arrangements at home.

During this interview, Lwiza advised that she had moved to the United States from Uganda, Africa to live with her father on July 21st, 2006. She further advised that she has sleeping in the same bed with her father because she has reoccurring nightmares of tribal wars in Uganda. However, she again denied that he ever touched her in an inappropriate manner or that they had engaged in sexual intercourse. I therefore advised Lwiza that based on Jessica's allegations, we would be conducting a search for physical evidence at their residence and that I was concerned that we were going to find evidence that she had sexual intercourse with Severine. Upon making this statement, Lwiza began crying and advised that she had in fact engaged in sexual intercourse with her father. Lwiza explained that she woke up on the evening of July 22nd, 2006 and discovered that Severine was having sexual intercourse with her. She stated that she did not consent to have sexual intercourse with him on that occasion but did not physically resist. She further advised that her father has had sexual intercourse with her on six additional occasions and that each incident occurred in his bedroom. Lwiza stated that she did not consent to these sexual encounters but believed that her father's conduct was okay due to her upbringing in Uganda. She stated that the boys in Uganda frequently grab a girl's breasts in a degrading manner. Lwiza also stated that she had informed her sister, Theresa, regarding their father's behavior (Theresa did not disclose anything to her). (See Transcript for further details).

After obtaining a formal statement from Lwiza (it was recorded on DVD in the presence of Marleny, a representative from Bridges Domestic & Sexual Violence Support), I ended my contact. Marleny remained with Lwiza at that time in order to provide support and further assistance. Investigation ongoing.

Detective Jonathan B. Lehto D-36 *JBL*

*only DVD are at 1057 HRS and   H   HRS*

A.26



THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS.                                    SUPERIOR COURT
SOUTHERN DISTRICT

\* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                          \*          Part 1
                                          \*
THE STATE OF NEW HAMPSHIRE                \*
                                          \*                      (3
v.                                        \*
                                          \*
SEVERINE WAMALA                           \*
                                          \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \*


## PENDING MOTIONS AND SUPPRESSION HEARING

TRANSCRIPT OF HEARING, ELECTRONICALLY
RECORDED AT HILLSBOROUGH COUNTY SUPERIOR COURT,
NASHUA, NEW HAMPSHIRE, ON JULY 2, 2007,
BEFORE THE HONORABLE BERNARD J. HAMPSEY, JR.,
PRESIDING JUSTICE

Appearances:

For the State:          Roger Chadwick, Jr., Esq. and
                        Patricia LaFrance, Esq.
                        COUNTY ATTORNEY'S OFFICE
                        30 Spring Street
                        Nashua, NH  03060


For the Defendant:      Anthony Sculimbrene, Esq. and
                        Seth Abramson, Esq.
                        PUBLIC DEFENDER'S OFFICE
                        188 Main Street
                        Nashua, NH  03060


Court Monitor:          Diane Boucher

---

RECEIVED
MAY 01 2008
By

2007 AUG -3  A  35
HILLSBOROUGH COUNTY
SUPERIOR COURT S.S.

**AVICORE** Reporting

25 Lowell Street          Certified                    (603) 666-4100
Suite 405         Videographers & Court Reporters   Toll Free (888) 212-2072
Manchester, NH 03101-1647      VIDEOCONFERENCING        Fax (603) 666-4145

www.AvicoreReporting.com        Email: info@AvicoreReporting.com

A·27(i)

2

## INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| State's Witness: | | | | |
| LISA NADWORNY | | | | |
| By Ms. LaFrance | 9 | | | |
| By Mr. Sculimbrene | | 21 | | |
| | | | | |
| SCOTT CISZEK | | | | |
| By Ms. LaFrance | 29 | | 45 | |
| By Mr. Sculimbrene | | 39 | | 49 |
| | | | | |
| JONATHAN LEHTO | | | | |
| By Mr. Chadwick | 52 | | | |

A 27 (ii)

93

1    MR. ABRAMSON:  I think that would be good enough,

2    Judge.

3    THE COURT:  I won't mention -- I won't mention

4    tennis because I don't think that's proper to mention that,

5    so I won't.  But would some -- could I have somebody get the

6    word downstairs quickly to the marital people about Plaisted

7    tomorrow.

8    [Colloque not transcribed]

9    MR. CHADWICK:  Are we set?  May I proceed?

10   THE COURT:  Let me think about that for a while.

11   Yes, go right ahead.

12   BY MR. CHADWICK:

13   CHADWICK Q.  So, you were talking about special hugs and

14   defendant being undressed and those sorts of things.  What

15   happens after that?

16   LEHTO A.  At some point during the interview, Mr. Wamala

17   stated that he wanted to hear the allegations directly from

18   his daughters.  We alluded to the fact that Luisa had also

19   made some statements of a sexual nature against him.  He

20   stated that he wanted to speak with both of his daughters.  I

21   told him that that was not possible, that we needed to

22   resolve the issue before I could make that happen.

23   CHADWICK Q.  Let me stop you there.  Earlier it was stated the

A. 27a

1   only allegations you had when you went to that interview room

2   with Mr. Wamala was Jessica's?

3   LEHTO   A.   That's correct.

4   CHADWICK Q.   How do you bring up Luisa's?

5   LEHTO   A.   We lied to Mr. Wamala and stated that we had also

6   had some allegations from Luisa.  We didn't get into any

7   specifics, but we stated that both daughters that we had

8   spoken to had made some sexual assault allegations against

9   him at that point as an interview tactic.

10  CHADWICK Q.   And what is he saying?

11  LEHTO   A.   At that point, he stated that he wanted to speak

12  with his daughters.  He wanted to get the allegations

13  directly from them.  He stated that he didn't believe that

14  they had said those things.

15          I informed him that this was not something that had

16  just come up over night.  I stated that we had written

17  documentation from Jessica dating back to when she was in

18  sixth grade in which she detailed some sexual abuse at his

19  hands.

20          We stated that I would let him speak with Jessica,

21  but I could show him the paperwork and that would confirm the

22  allegations that this was not something that had come up over

23  night due to the argument earlier and that these were not

A.28

1     --

2              THE COURT:  I'm going to -- I'm going to allow it.

3     He's saying that at this point after talking with the

4     supervisor, he understood that from I don't know what point

5     on, he can clarify that, I'm not trying to put words in his

6     mouth, that the defendant was not free to leave and,

7     therefore, Miranda would be required or something to that

8     effect.  And if he's not free to leave, he would be,

9     therefore, in custody.

10             Sort of -- I'm not sure.  He can -- he can go over

11    that one more time.  I understand that it's -- that is an

12    issue here, but how he -- either what he was told by a

13    supervisor or what understanding he had or what exchange he

14    had with the defendant, you can cover that.

15    BY MR. CHADWICK:

16    CHADWICK Q.  So you interview Luisa?

17    LEHTO   A.  That's correct.

18    CHADWICK Q.  Do you remember roughly -- that interview obviously

19    ended somewhere between 8:00 or so when you started and 10:00

20    when you go back to Mr. Wamala?

21    LEHTO  A.  That's correct.

22    CHADWICK Q.  All right.  And is it -- are you told about Mr.

23    Wamala and told look, he's not going to leave the police

A.29

1    department, he's in custody --

2          MR. SCULIMBRENE:  I'm going to object, Your Honor.

3    That's a leading question.

4          MR. CHADWICK:  I'm just trying to get him back to

5    where we were, Judge.

6          THE COURT:  Yeah.  Yeah, I'll -- I'll allow that.

7    BY MR. CHADWICK:

8    CHADWICK   Q.  Is that before or after you interview Luisa Wamala?

9    LEHTO    A.  After interviewing Luisa, we had a second victim.

10   We had a second individual who was claiming sexual abuse at

11   the hands of Mr. Wamala.  It was no longer a situation where

12   we had Jessica Wamala's word against Mr. Wamala's word; he

13   said, she said situation.  We had two individuals claiming

14   similar types of behavior on behalf of Mr. Wamala.

15         And at that point, in discussions and consultation

16   with my supervisors, we decided that we had sufficient

17   probable cause at that point to make an arrest and,

18   therefore, I was going to attempt to interview Mr. Wamala one

19   more time.  However, at that point, he was not free to leave

20   the station and that decision was made after the interview

21   with Luisa.  I, therefore, read him his Miranda Rights prior

22   to conducting any further interview at that point.

23   CHADWICK   Q.  When you go back into that interview room with Mr.

A.30

COPY

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS.                                    SUPERIOR COURT
SOUTHERN DISTRICT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                      \*
  THE STATE OF NEW HAMPSHIRE         \*        *Part 2*
                                      \*
  v.                                  \*    RECEIVED
                                      \*    MAY 0 1 2008
  SEVERINE WAMALA                     \*
                                      \*    By
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PENDING MOTIONS AND SUPPRESSION HEARING

TRANSCRIPT OF HEARING, ELECTRONICALLY
RECORDED AT HILLSBOROUGH COUNTY SUPERIOR COURT,
NASHUA, NEW HAMPSHIRE, ON JULY 3, 2007,
BEFORE THE HONORABLE BERNARD J. HAMPSEY, JR.,
PRESIDING JUSTICE

**Appearances:**

For the State:        Roger Chadwick, Jr., Esq. and
                      Patricia LaFrance, Esq.
                      COUNTY ATTORNEY'S OFFICE
                      30 Spring Street
                      Nashua, NH  03060


For the Defendant:    Anthony Sculimbrene, Esq. and
                      Seth Abramson, Esq.
                      PUBLIC DEFENDER'S OFFICE
                      188 Main Street
                      Nashua, NH  03060


Court Monitor:        Diane Boucher

---

# *AVICORE* Reporting

25 Lowell Street            **Certified**                    (603) 666-4100
Suite 405          **Videographers & Court Reporters**   Toll Free (888) 212-2072
Manchester, NH 03101-1647      **VIDEOCONFERENCING**        Fax (603) 666-4145

www.AvicoreReporting.com          Email: info@AvicoreReporting.com

A.30a ,→A.31

2

## INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

State's Witnesses:

JONATHAN LEHTO

By Mr. Chadwick          66

By Mr. Sculimbrene       5


ROBERT PAGE

By Mr. Chadwick     83


Closing Argument:

Mr. Sculimbrene, page 96


Motion for Bill of Particulars:

By Mr. Abramson, page 101, 110

By Mr. Chadwick, page 108


Examination of Mr. Wamala:

By The Court, page 111


Statement of Mr. Wamala, page 118

A.30b → A.31

A ⟶ COUNSEL  SCULIMBRENE
Q ⟶ LEHTO

1       A.   That's correct.

2       Q.   Officers are having confidential conversations?

3       A.   Potentially.

4       Q.   And you're saying he can just walk out, yet it's a

5    secured building, right?

6       A.   What I said was he could walk out.  I said typically

7    somebody will ask if they want to leave and we will escort

8    them from the building.

9       Q.   I'm not saying if he has the physical ability

10   because he's not impaired, he's not handicapped.  He could

11   walk.  But he wasn't able to just get up and walk about in

12   the police station because it's a secured facility.

13              THE COURT:  Sculimbrene, you're beating --

14              MR. SCULIMBRENE:  Thank you, Your Honor.

15              THE COURT:  -- this to death.  The needle is stuck

16   as we used to say back in my day whether it's at 45 or 78.

17   Move on.

18              MR. SCULIMBRENE:  Thank you, Your Honor.

19   BY MR. SCULIMBRENE:  ⟶ COUNSEL

20   COUNSEL Q.   You talked to him for approximately three hours,

21   correct?

22   LEHTO A.   That's correct.

23   COUNSEL Q.   And towards the end of the discussion -- first of

A.31

1   all, he denied having anything to do with the sexual abuse of

2   his children, correct?

3   LEHTO  A.   He denied the sexual abuse.

4   COUNSEL  Q.   Yes.  He denied it at the beginning of the

5   interview?

6   LEHTO  A.   That's correct.

7   COUNSEL  Q.   He denied it at the end of the interview?

8   LEHTO  A.   That's correct.

9   COUNSEL  Q.   Okay.  So at no time did he make an admission of

10   sexually abusing his children?

11   LEHTO  A.   He made some statements of an inflammatory nature,

12   but he didn't make any admissions to sexually assaulting her

13   as in having intercourse with any of his daughters.

14   COUNSEL  Q.   But he never said he had any sexual contact with

15   them?

16   LEHTO  A.   He stated he had some contact with them.

17   COUNSEL  Q.   Sexual contact, Officer?

18   LEHTO  A.   It depends on what your definition of sexual contact

19   is.  He admitted to giving them hugs, to giving them hugs

20   while he was wearing little or no clothing.

21   COUNSEL  Q.   You said he was wearing a towel yesterday?

22   LEHTO  A.   That's correct.

23   COUNSEL  Q.   Okay.  And then he was under his sheets when he gave

A·32·

1  them hugs?

2  LEHTO  A.  That's correct.

3  COUNSEL  Q.  Okay.

4  LEHTO  A.  But he was -- he was not clothed beneath the sheet

5  or not clothed beneath the towel, so little or no clothing.

6  COUNSEL  Q.  There was no -- no visible body parts?

7  LEHTO  A.  Not according -- not according to Mr. Wamala, no.

8  COUNSEL  Q.  So he never made any admissions about sexually

9  abusing his children?

10  LEHTO  A.  No.

11  COUNSEL  Q.  Okay.  At the end of the interview, he says to you

12  something to the effect of I'll tell you whatever you want to

13  hear?

14  LEHTO  A.  That's correct.

15  COUNSEL  Q.  And at that point, you said I'm going to stop this

16  interview.  This isn't helpful.  Why did you stop the

17  interview?

18  LEHTO  A.  Because at that point, I didn't believe that I was

19  going to be able to get a credible statement from Mr. Wamala

20  any further.

21  COUNSEL  Q.  Now, as a police officer, there's a problem with

22  somebody saying, I'll tell you whatever you want to hear in

23  an interview.

A.33

1  LEHTO    A.   That would be correct.

2  COUNSEL  Q.   What's the problem?

3  LEHTO    A.   That -- at that point, I can't establish the

4     credibility or the reliability of what someone is telling me

5     at that point and that's what I'm there to do.  I'm there to

6     seek the truth and to determine facts.  And at that point, if

7     someone's just going to tell me what they think I want to

8     hear, then at that point I can't establish the reliability of

9     anything they say beyond that.

10 COUNSEL  Q.   Okay.  And you said on your direct examination

11    yesterday that during the 3:15 -- 3:15 a.m. interview, you

12    talked to Dr. Wamala about allegations that Jessica had made

13    and Luisa had made --

14 LEHTO    A.   That's correct.

15 COUNSEL  Q.   -- correct?  But as we talked about earlier, when

16    you talked to them, Luisa had not made any admission?

17 LEHTO    A.   And I stated that yesterday.

18 COUNSEL  Q.   And you said yesterday that you had lied to him as a

19    tactic to get him to confess?

20 LEHTO    A.   That's correct.

21 COUNSEL  Q.   But that didn't work.  He didn't make any -- he

22    didn't make any admissions?

23 LEHTO    A.   To sexually assaulting Luisa, no.

A·34

1  COUNSEL  Q.   You also said yesterday that you presented him with

2     what you called the time capsule, correct? (see A.47)

3  LEHTO   A.   That's correct.

4  COUNSEL  Q.   And you said that you'd obtained this from Officer

5     Nadworny?

6  LEHTO   A.   Yes.

7  COUNSEL  Q.   And she had gotten it from Jessica?

8  LEHTO   A.   I -- I don't know who specifically she got it from.

9     Jessica advised that she gave it to one of the officers.  We

10    made contact with Officer Nadworny, who was there, and

11    Officer Nadworny gave me the envelope and said that it was

12    Jessica's time capsule.  I can't testify to where Officer

13    Nadworny got it.  I wasn't present when she obtained it.

14 COUNSEL  Q.   Did you make an indication of presenting of the time

15    capsule in your 3:15 a.m. report?

16 LEHTO   A.   Excuse me?

17 COUNSEL  Q.   Did you note that you presented him with a time

18    capsule at the 3:15 a.m. report?

19 LEHTO   A.   Again, I'd have to look at my report.  I don't

20    recall whether I documented that or not.

21            THE COURT:  If you think you need to show him that,

22    go right ahead.  I'm sure he can tell rather quickly if he

23    did or did not.

A.35

1  LEHTO  A.   It's not documented in there, no.

2  BY MR. SCULIMBRENE: → COUNSEL

3  COUNSEL Q.   All right.  So when you said that yesterday, it was

4     in contradiction to your report that you wrote on the day or,

5     correct?

6  LEHTO A.   No, it doesn't state either way in the report there.

7  COUNSEL Q.   Well, you know, you went to the Police Academy?

8  LEHTO A.   Yes, I did.

9  COUNSEL Q.   And you were trained in writing reports?

10  LEHTO A.   Correct.

11  COUNSEL Q.   And you were told to put all the important facts in

12     that?

13  LEHTO A.   Correct.

14  COUNSEL Q.   And you thought that this fact was so important

15     because you thought it would get him to confess to something.

16     It may be one of those things that broke his will and said I

17     did it, that's why you presented it to him?

18  LEHTO A.   It was an interview tactic, correct.

19  COUNSEL Q.   Yeah.  It's a really important thing you think

20     because you presented it to him at a moment when he was not

21     saying what you wanted him to say

22  LEHTO A.   It was -- correct.   It was an interview tactic.

23  COUNSEL Q.   Okay.  And yet you didn't mark that on your report?

A·36

1  LEHTO  A.  No, he made no admissions once shown the time

2  capsule and I put in my report that he denied sexually

3  assaulting Jessica, so it's very consistent. See A·47 Time Capsule

4  COUNSEL Q.  Now, Officer, you just said that you didn't put it

5  in there because he didn't admit to anything?

6  LEHTO  A.  That's correct.

7  COUNSEL Q.  Are there anything else where he denied it that you

8  didn't record?

9  LEHTO  A.  Again, in my report it states that he denied

10  sexually assaulting Jessica: I didn't cover that fact.  I'm

11  not withholding that fact.  It's clearly stated in my report

12  I believe several times that he denied those accusations.

13          I used several different interview tactics while

14  speaking with Mr. Wamala and it would be a very lengthy

15  report if I put every statement I made in there that he --

16  COUNSEL Q.  You could record it.

17  LEHTO  A.  What's that.

18  COUNSEL Q.  You could record it, so you wouldn't have to write

19  it down.

20  LEHTO  A.  He do not record those statements.

21  COUNSEL Q.  Okay.  But the statements in which he makes denial,

22  the statements in which says no, they're unrecorded on your

23  digital transcriber that you have with you and you don't

A·37

1    bother to write them down.  These are things that are

2    exculpatory to the case and you don't write them down.

3  LEHTO   A.  I put in my report that he made denials and

4    continually denied that he sexually assaulted his children.

5  COUNSEL  Q.  Okay.

6  LEHTO   A.  I certainly did not withhold that material.  I

7    didn't withhold any exculpatory material.  I put in there

8    and, again, I belive I put it several times or at least more

9    than once that he denied those accusations.  There was

10   nothing withheld and, again, I used several different

11   interview tactics and different statements and different

12   rationalizations when I speak to a suspect.

13           And when I'm speaking to them, I don't put all

14   those rationalizations into the report as long as I put their

15   statements, and his statement was that he denied --

16 COUNSEL  Q.  Okay.

17 LEHTO   A.  -- having any sexual contact with them.

18 COUNSEL  Q.  Let's talk about another tactic.  Detective Page

19   gets up and leaves and he says I don't want to hear these

20   lies any more.

21 LEHTO   A.  Correct.

22 COUNSEL  Q.  Now, that's supposed to, you know, put pressure on

23   Dr. Wamala so now to make him want to confess?

A.38

LEHTO   A.   It's, again, an interview tactic whereby and, again,

I can't testify to what was in Detective Page's mind, but

typically, it is used to hopefully gain favor with Mr. Wamala

and myself.  Hopefully he will take me into his confidence at

that point, see me as a more sympathetic figure with him.

And, again, it's an interview tactic whereas he will

hopefully take me into his confidence and make the

admissions.

COUNSEL  Q.  This is good cop, bad cop, right, I mean to put it

bluntly?

LEHTO   A.   Again, there was nothing heated in the conversation,

but it's hopeful that he will find me more likeable than he

does Detective Page.

COUNSEL  Q.  And Detective Page was perfectly courteous as he

left the door and said I'm listening to no more lies?

LEHTO  A.  Well, again, he stated it bluntly.  He wasn't going

to listen to any more lies and that he was going to go work

on some paperwork.

COUNSEL  Q.  Okay.

LEHTO   A.  But he certainly wasn't discourteous.

COUNSEL  Q.  And just so we're clear, you talked to -- started

talking to Dr. Wamala at 3:15.  You ended around 6 --

LEH TO  A.  6:15 or so.

A·39

COUNSEL Q.   6:15, so it was about three hours.   You never gave

him Miranda?

LEHTO A.   No.

COUNSEL Q.   You didn't record it?

LEHTO A.   No.

COUNSEL Q.   Okay.   At the point that you decide that you're

going to arrest, what were you -- let me rephrase that.   Do

you remember when you first booked Dr. Wamala in?   Do you

remember what time it was?

LEHTO A.   I don't have an exact as to what the booking tape

says.   It would have been shortly after 10:00 and my estimate

would be around 10:15 or so.   I'd have to take a look at my

documentation for that.

COUNSEL Q.   When you came back -- when you ended the interview

and you talked about this yesterday, you said at that point

it was just a he said, she said and that's why you didn't

feel that there was any need to arrest him, bring him into

custody, read him Miranda because it was just a he said, she

said.   You said yesterday that that was not enough to

establish probable cause in your mind?

LEHTO A.   That's correct.   He would not have been taken in to

custody that evening had it remained Jessica's word against

Mr. Wamala's word.

A.40

1  COUNSEL  Q.  So just the naked accusation from Jessica, that's

2  it, that's not enough?

3  LEHTO  A.  It's not sufficient for our procedures and policies

4  within our division, no.

5  COUNSEL  Q.  Now, let's talk about the 9:58 transcripted

6  interview.  This is the interview in which you read Dr.

7  Wamala his Miranda Rights, correct?

8  LEHTO  A.  That's correct.

9  COUNSEL  Q.  And you had this transcribed on your Phillips

10  transcriber?

11  LEHTO  A.  Yes.

12  COUNSEL  Q.  And you had talked to him about a number of

13  different things.  You were explaining to him what his right

14  were so on and so forth.  This is the first time you've gone

15  through those rights, correct?

16  LEHTO  A.  That's correct.

17  COUNSEL  Q.  And when you talked to him about he wants a lawyer,

18  he -- you can have a lawyer, he instantly asks for a lawyer

19  and that's when you instantly ended the interview, correct?

20  LEHTO  A.  I'd have to take a look, but I believe that's --

21  that's accurate.

22  COUNSEL  Q.  By the time you get to the transcribed interview, he

23  had been at the station for seven hours, correct?

A.41

1  LEHTO  A.   That's correct.

2  COUNSEL  Q.   Okay.  Seven hours and you question him for three

3      hours, no Miranda?

4  LEHTO  A.   That's correct.

5  COUNSEL  Q.   Take buccal swabs from him, no Miranda?

6  LEHTO  A.   That's correct.

7  COUNSEL  Q.   This is after you've taken him from his house with

8      no Miranda.  And how in the transcripted interview, you

9      decide to read him Miranda for the first time.  You get to

10     the part about a lawyer and he says, I want a lawyer.  That's

11     why you end the interview, correct, because he asked for a

12     lawyer?

13              MR. CHADWICK:  No, I believe the Detective said he

14     had to look at the transcript before he could answer that

15     question he was asked a few minutes ago.

16              THE COURT:  Well, he essentially said when he

17     invoked his right to counsel, that's when the interview ended

18     and I thought this has been covered.

19              MR. SCULIMBRENE:  Okay.

20              THE COURT:  Already.

21              MR. SCULIMBRENE:  Okay.  Yup.

22     BY MR. SCULIMBRENE:

23          Q.   Before he invoked his right to counsel, he mentioned

A.41a

Ref: 06-61505-OF

## Nashua Police Department
### Voluntary Statement Form

CASE #:

DATE:                    TIME:                    PLACE:

, give the following voluntary statement to        , who has identified himself as a member of the Nashua,

New Hampshire Police Department. He has advised me and I understand the following:

1.  I have the right to remain silent and not give this statement or incriminate myself in any way.

2.  Anything I say in this statement can and will be used against me in a court of law.

3.  Even if I cannot afford a lawyer, I have the right to have one paid for by the court and to talk to a lawyer for advice before giving this statement and to have him/her with me during this statement.

4.  If I decide to give this statement now without a lawyer present, I still have the right to stop giving this statement at any time.

5.  No threats or promises have been made either against or to me to obtain this statement.

6.  I knowingly and purposely waive my right to the advice and presence of a lawyer before and during this statement.

7.  I give this statement voluntarily of my own free will and accord.

Signed_____

Witness_____  Date _____  Time_____

DETECTIVE J. LEHTO: Good morning this is Detective Jon Lehto, it's the 12th day of September 2006, its approximately 10:57 am. I'm in YSD interview room number two utilizing my Philips transcriber and this interview is also being recorded on DVD and in the room with me today is Lwiza say your last name for me.

LWIZA WAMALA: Wamala

DETECTIVE J. LEHTO: I'm sorry.

LWIZA WAMALA: Wamala.

DETECTIVE J. LEHTO: Wamala, can you spell that for me.

LZA WAMALA: WAMALA

DETECTIVE J. LEHTO: WAMALA. I'm just going to ask you to speak up just a little bit just so that

A.42

Ref: 09-61505-DF

*Lwiza Interview Avo*
*11:27am*

# Nashua Police Department
## Voluntary Statement Form

CASE # :

DATE:                    TIME:                    PLACE:

I,        , give the following voluntary statement to        , who has identified himself as a member of the Nashua,

New Hampshire Police Department. He has advised me and I understand the following:

1.  I have the right to remain silent and not give this statement or incriminate myself in any way.

2.  Anything I say in this statement can and will be used against me in a court of law.

3.  Even if I cannot afford a lawyer, I have the right to have one paid for by the court and to talk to a lawyer for advice before giving this statement and to have him/her with me during this statement.

4.  If I decide to give this statement now without a lawyer present, I still have the right to stop giving this statement at any time.

5.  No threats or promises have been made either against or to me to obtain this statement.

6.  I knowingly and purposely waive my right to the advice and presence of a lawyer before

and during this statement.

7.  I give this statement voluntarily of my own free will and accord.

Signed_____

Witness_____     Date _____     Time_____

**DETECTIVE LEHTO:** Good afternoon this is Detective Jon Lehto. It's approximately 11:27 a.m. I am back in YSD Interview room #2 with Marleny from Rape and Assault and Lwiza Wamala um and I just have a couple questions just to clarify something okay. Um, the first time that this happened on July 22nd okay um were you sleeping when this started?

**LWIZA WAMALA:** Yes.

**DETECTIVE LEHTO:** You were?

**LWIZA WAMALA:** Yes.

**DETECTIVE LEHTO:** Okay um so this happened unexpectedly?

**LWIZA WAMALA:** Yes.

A.43


## Nashua Police Department
### Voluntary Statement Form

CASE #:

DATE:                    TIME:                    PLACE:

I,            , give the following voluntary statement to            ,who has identified    as a member of the

Police Department.  has advised me and I understand the following:

1.   I have the right to remain silent and not give this statement or incriminate myself in any way.

2.   Anything I say in this statement can and will be used against me in a court of law.

3.   Even if I cannot afford a lawyer, I have the right to have one paid for by the court and to talk to a lawyer for advice before giving this statement and to have him/her with me during this statement.

4.   If I decide to give this statement now without a lawyer present, I still have the right to stop giving this statement at any time.

5.   No threats or promises have been made either against or to me to obtain this statement.

6.   I knowingly and purposely waive my right to the advice and presence of a lawyer before and during this statement.

7.   I give this statement voluntarily of my own free will and accord.

Signed_____

Witness_____   Date _____   Time_____

DETECTIVE BERGERON:  Good morning. This is uh Detective Bergeron. It is September 12, 2006. It's approximately 2:45 am. I' am in a YSD interview room utilizing a Philips digital handheld recorder. In the room with he is Jacob Wamala. Jacob, am I saying your name right?

JACOB WAMALA:  Yes you are.

DETECTIVE BERGERON:  Can you spell your first and last name for me?

JACOB WAMALA:  J A C O B, W A M A L A.

DETECTIVE BERGERON:  And where do you live Jacob?

JACOB WAMALA:  6 Danforth Road, Apartment 22.

DETECTIVE BERGERON:  O....

A.44

WITNESS STATEMENT - JACOB WAMALA (9/12)
Ref: 06-61505-OF

JACOB WAMALA: Uh, my dad kind of like favored Jessica a lot and gave her whatever she wanted.

DETECTIVE BERGERON: Yup.

JACOB WAMALA: Basically.

DETECTIVE BERGERON: Um, did she say or, did she, could she give you like an approximation of how many times, like in Lowell, things happened?

JACOB WAMALA: No.

DETECTIVE BERGERON: Or....

JACOB WAMALA: She said it was like.... I, I don't know.

DETECTIVE BERGERON: Was it a, like a daily occurrence? Was it weekly?

JACOB WAMALA: Ya, she, I think she said it was more.... It wasn't everyday she said that but she said it was like, pretty frequent.

DETECTIVE BERGERON: OK. Have you....

JACOB WAMALA: It was more than once a week.

DETECTIVE BERGERON: Had you ever, ever seen them together?

JACOB WAMALA: Never.

DETECTIVE BERGERON: OK.

JACOB WAMALA: I would have never thought of that.

DETECTIVE BERGERON: OK.

JACOB WAMALA: Ever.

DETECTIVE BERGERON: How....

JACOB WAMALA: Even still, be like how....

DETECTIVE BERGERON: Ya.

JACOB WAMALA: Caught me totally by surprise.

DETECTIVE BERGERON: Now when Jessica....

JACOB WAMALA: I asked (Inaudible)

DETECTIVE BERGERON: Told you that, I mean.... Did you believe her?

JACOB WAMALA: I almost didn't believe her.

DETECTIVE BERGERON: OK.

JACOB WAMALA: But she was crying so much.

DETECTIVE BERGERON: OK. How is Jessica? Is Jessica an honest person?

JACOB WAMALA:

A. 45

Ref: 06-61505-OF

DETECTIVE BERGERON:  If she'd tell you something like that....

JACOB WAMALA:  Well actually, oh if it's about that, that, there's definitely some issue in my book.

DETECTIVE BERGERON:  OK.

JACOB WAMALA:  I mean she used to really be deceitful though.

DETECTIVE BERGERON:  OK.

JACOB WAMALA:  But I think it's because of the fact....

DETECTIVE BERGERON:  This is....

JACOB WAMALA:  She had to be like....

DETECTIVE BERGERON:  Oh.

JACOB WAMALA:  Be careful about what she says cause my dad had a wife back then too.

DETECTIVE BERGERON:  OK. Um....

JACOB WAMALA:  Living in that house.

DETECTIVE BERGERON:  But, you, is, when was the last time there's been a, a woman living in the house with you and the kids? Like, you know what I mean? You....

JACOB WAMALA:  Last year.

DETECTIVE BERGERON:  Huh?

JACOB WAMALA:  Last year.

DETECTIVE BERGERON:  Last year?

JACOB WAMALA:  Um.

DETECTIVE BERGERON:  Who, who was that?

JACOB WAMALA:  Pamela.

DETECTIVE BERGERON:  Who's that?

JACOB WAMALA:  My stepmother.

DETECTIVE BERGERON:  Your stepmother?

JACOB WAMALA:  Yes.

DETECTIVE BERGERON:  OK. And Pamela lives in Lowell right now?

JACOB WAMALA:  Yup, lives in Lowell.

DETECTIVE BERGERON:  But she left last year?

JACOB WAMALA:  We left last year.

DETECTIVE BERGERON:  You guys left and came to Nashua?

JACOB WAMALA:  Yes.

A. 45a

09-12-06 0100 HOURS - SEVERINE WAMALA (6 DANFORTH ROAD #22)
     Ref: 06-61505-OF

On 11Sep06 at approximately 0100 Hours, Sergeant F. Bourgeois contacted me via telephone and advised at uniform patrol officers had responded to 6 Danforth Road #22, Nashua, NH at approximately 2335 Hours (9/11/06) ference a check conditions call involving possible child abuse. He further advised that upon being terviewed at the scene, 15-year-old Jessica Wamala ⁀ ⁻ ⁻ ⁻ ⁻ _; disclosed that her father, Severine amala (⁀⁻ ⁻ ⁻ ), had been "raping her" for a long time. As a result, the uniform patrol officers had ked Jessica Wamala, her brother Jacob Wamala ( ⁻ ⁻) and their sister Lwiza Wamala (DOB:
     , to respond to the Nashua Police Station in order to be interviewed regarding the alleged sexual abuse d they had agreed to do so. While they were receiving transportation to the Station, Detective R. Page and I sponded to the scene in order to further the investigation.

Upon arrival at 6 Danforth Road #22, Detective Page and I made contact with Officer S. Ciszek who was serving the scene. He advised that Jessica, Jacob and Lwiza's father, Severine Wamala ⁻ ⁻ ⁻ ⁻ ⁻ s aware of the allegations but had gone to bed while awaiting our arrival. Detective Page and I therefore de contact with Mr. Wamala and requested to speak with him regarding the situation. Mr. Wamala advised t he was willing to talk about what had happened and claimed that Jessica and Jacob were just being defiant d disobedient. I therefore asked if he was willing to go to the Nashua Police Station in order to discuss the tter and he voluntarily agreed to do so. Mr. Wamala however advised that he did not have a means of nsportation. Detective Page and I therefore offered to drive him to the Station and Mr. Wamala accepted our itation. We therefore transported him to the Nashua Police Department and after Mr. Wamala had received a sitor's Badge, we escorted him to CID Interview Room #3. Investigation ongoing.

tective Jonathan B. Lehto D-36

A. 46

# "TIME CAPSULE"

## Learning for Knowing

## Who am I?

1. Happiness to me means

_____

_____

_____

everyone is happy and havein a good time
with each other)

2. When I am really bored, I sometimes daydream about

_____

_____

_____

boys that are cute and najib

3. Something about me that would surprise most people is

_____

I'm not a virgin or have a virgin mouth

_____

4. Someday I would like to

_____

_____

or married get rich and have 5 kids

A.47